## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JODIE MARIE HURST, | ) | CASE NO. 5:23-CV-01722-JDA |
| Plaintiff, | ) | |
| | ) | U.S. MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL ARMSTRONG |
| v. | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| COMMISSIONER OF SOCIAL | ) | **ORDER** |
| SECURITY, | ) | |
| Defendant, | ) | |
| | ) | |

### I.      INTRODUCTION

Plaintiff, Jodie Marie Hurst ("Ms. Hurst") seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner")[1] denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF No. 1.) This matter is before me pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The parties have consented to the jurisdiction of this Court pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1. (ECF No. 7.) For the reasons set forth below, the Court AFFIRMS the Commissioner's final decision.

### II.     PROCEDURAL HISTORY

On August 20, 2019, Ms. Hurst was found not disabled in a previous ALJ decision. (Tr. 80-98.)[2] On January 7, 2020, Ms. Hurst filed applications for DIB and SSI, alleging a disability onset date of August 16, 2019. (Tr. 289-98.) She alleged disability due to arthritis, knee issues and pain, spinal stenosis, degenerative disc disease, leg pain, depression, anxiety, and pain medicine

---

[1] Martin O'Malley became the Commissioner of Social Security on December 20, 2023.
[2] The administrative transcript ("Tr.") appears at ECF No. 6 on CM/ECF. All page number references to the administrative transcript herein are to the Bates numbers on the bottom right-hand corner. All other record references are to the electronically stamped CM/ECF document ("ECF No.") and PageID# rather than any internal pagination.

addiction. (Tr. 99.) Her applications were denied initially and upon reconsideration. (Tr. 179-83, 185-92.) On December 15, 2022, an administrative law judge ("ALJ") held an administrative hearing, where Ms. Hurst, represented by counsel, and a vocational expert ("VE") testified. (Tr. 39-79.) The ALJ issued a written decision on January 26, 2023, finding Ms. Hurst was not disabled within the meaning of the Social Security Act. (Tr. 17-32.) The ALJ's decision became final on July 3, 2023, when the Appeals Council declined further review. (Tr. 1-6.)

On September 1, 2023, Ms. Hurst filed her Complaint, challenging the Commissioner's final decision. (ECF No. 1.) Ms. Hurst asserts a single, multi-part issue assignment of error:

(1) Whether the ALJ failed to identify substantial evidence supporting the residual functional capacity finding, failed to evaluate the medical opinions pursuant to the regulations, and failed to evaluate Plaintiff's allegations pursuant to the appropriate legal standards.

(ECF No. 9, PageID#1490.)

### III.  BACKGROUND

#### A.  Personal, Educational, and Vocational Information

Ms. Hurst was born in 1975, and she was 44 years old on the alleged disability onset date. (Tr. 289, 293.) She has a tenth-grade education. (Tr. 320.) Her past relevant work was employment as a cashier and nursing assistant. (*Id.*)

#### B.  Relevant Non-Medical/Medical Opinion Evidence

##### 1.  Fredrick Hayek, MD

In February 2022, Dr. Hayek completed a Mental Residual Functional Capacity Questionnaire for Ms. Hurst. (Tr. 1034.) In a series of checkboxes, Dr. Hayek provided opinions regarding the degree of functional limitations Ms. Hurst possessed due to her mental and physical impairments. Regarding Ms. Hurst's mental impairments, Dr. Hayek opined that Ms. Hurst had moderate limitations in understanding, remembering, or applying information and in interacting

with others. (Tr. 1034.) Dr. Hayek also opined that Ms. Hurst had marked limitations in maintaining concentration, persistence, or pace and adapting or managing oneself. (*Id.*) Dr. Hayek further opined that Ms. Hurst would be absent four or more days a month due to her mental impairments. (*Id.*) When asked to describe the clinical findings that demonstrate the severity of Ms. Hurst's mental impairments and symptoms, Dr. Hayek simply wrote "depression" and "altered concentration." (*Id.*)

The same month, Dr. Hayek also complete a Physical Residual Functional Capacity Questionnaire for Ms. Hurst. (Tr. 1035.) Dr. Hayek checked and circled a series of boxes indicating the functional limitations that stem from Ms. Hurst's physical impairments. (*See id.*) Dr. Hayek opined that Ms. Hurst could sit or stand for three hours and walk for four hours in an eight-hour workday; lift or carry up to 50 pounds occasionally and 10 pounds frequently; bend or squat occasionally; and never crawl or climb. (*Id.*) Dr. Hurst also opined that Ms. Hurst's symptoms would interfere with her ability to maintain and concentration occasionally, and that she would be absent from work approximately three days per month. (*Id.*)

### 2. *Bryan Krabbe, Psy.D.*

In October 2021, Ms. Hurst underwent a psychological consultative examination with Dr. Krabbe. Regarding Ms. Hurst's abilities and limitations in understanding, carrying out, and remembering instructions both one-step and complex, Dr. Krabbe wrote the following:

> The claimant performed adequately on a brief abstract reasoning activity, a task to assess difficulty understanding instructions. She performed below average on a brief short-term memory activity, a task to assess difficulty remembering instructions. The claimant performed adequately recalling digits forward, a simple structured tasked to assess short-term memory. She was able to converse effectively to complete the evaluation. She reported some problems with learning in school. She reported no significant problems learning work related tasks.

(Tr. 1042.)

3

Regarding Ms. Hurst's abilities in sustaining concentration and persisting in work-related activity at a reasonable pace, Dr. Krabbe wrote:

> The claimant had difficulty completing both serial 7s and serial 3s tasks, which suggests difficulty maintaining attention and focus. The claimant had difficulty recalling digits backwards, a simple structured task to assess attention and concentration. She displayed adequate task persistence when answering questions. She displayed no indication of distraction during the evaluation. She reported difficulty remembering appointments and medication. The claimant described symptoms of depression that could result in increased worry and a corresponding decrease in attention and concentration. She described a history of problems with attention and concentration in school. She reported a history of impulsive behavior in school. She described a history of problems with attention and concentration within work environments including difficulty completing tasks in a timely and effective manner.

(*Id.*)

Regarding her abilities in maintaining effective social interaction in a consistent and independent basis with supervisors, co-workers, and the public, Dr. Krabbe observed the following:

> The claimant did not describe a significant history of problems with teachers or classmates. The claimant functions within adequate limits of intellectual functioning to understand and respond to supervisor feedback and adequately relate to co-workers. On past work performance, she did not describe significant problems in responding appropriately to supervision and to coworkers in a work setting. Her longest period of employment at one company was 1 ½ years. She interacted appropriately and was pleasant during the evaluation. She has a few friends outside of her family.

(*Id.*)

Finally, regarding her abilities in dealing with normal pressures in a competitive work setting, Dr. Krabbe wrote:

> The claimant endorsed a history of emotional deterioration in response to work pressure. She displayed appropriate responses and affect during the examination when discussing past and current pressures. She has issues with previous drug use. She described symptoms of depression that may compromise her ability to respond to work pressures leading to increased emotional instability and withdraw. She has a history of a past suicide attempt. She has been psychiatrically hospitalized and is prescribed psychoactive medication.

4

(*Id.*)

### 3.  *State Agency Consultants*

#### a.  **Medical Consultants**

In September 2020, Lynne Torello, M.D., reviewed the record at the initial level of consideration. Dr. Torello indicated that her RFC finding was an adoption of the ALJ RFC determination from August 2019 based on AR 98-4. (Tr. 142.) As the prior ALJ concluded, Dr. Torello opined that Ms. Hurst could perform sedentary work except she must be afforded the opportunity for brief one to two-minute changes of position at intervals not to exceed 30 minutes without being off-task; can occasionally climb ramps or stairs, balance, stoop, crouch, and kneel; can never crawl or climb ladders, ropes, or scaffolds; should avoid concentrated exposure to extreme cold, extreme heat, and excessive vibration; and should avoid all exposure to hazards such as dangerous moving machinery and unprotected heights. (Tr. 141.)

In May 2022, Linda Hall, M.D., reviewed the record at the reconsideration level. Dr. Hall opined that Ms. Hurst could perform work at the light exertional level except she could lift and/or carry 20 pounds occasionally and 10 pounds frequently; could stand and/or walk for four hours and sit for six hours during an eight-hour workday; could never climb ladders, ropes, or scaffolds; could occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl; needed to avoid concentrated exposure to pulmonary irritants; and needed to avoid all exposure to hazards. (Tr. 152-54, 165-67.)

#### b.  **Psychological Consultants**

In October 2021, Jennifer Swain, Ph.D., reviewed the record at the initial consideration level. Dr. Swain found that Ms. Hurst had moderate limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. 140.) Dr. Swain further found that Ms. Hurst was able to

understand, remember, and carry out a two-step command involving simple instruction; work at a steady pace to sustain simple, routine tasks; interact in small groups of familiar listeners but not in settings where she would need to interact regularly with the general public or in large groups; and carry out tasks in settings where duties are relatively static and changes can be easily explained. (Tr. 142-44.) In April 2022, Paul Tangeman, Ph.D., reviewed the record at the reconsideration level and affirmed Dr. Swain's findings. (Tr. 151, 154-56, 164, 167-69.)

### C.  Relevant Medical Evidence

Ms. Hurst underwent surgery of bilateral recess decompression in her lumbar spinal cord on February 28, 2018. (Tr. 377-415.) On November 4, 2019, Fredrick Hayek, M.D., evaluated Ms. Hurst for lumbar radiculopathy.[3] (Tr. 780-82.) Her existing medication regimen included ibuprofen, Lorazepam, gabapentin, duloxetine, and buprenorphine. (Tr. 780.) She reported chronic low back pain but also denied all current symptoms in the Review of Systems, including muscle aches, muscle weakness, arthralgias/joint pain, back pain, swelling in the extremities, depression, anxiety, suicidal thoughts, and fatigue. (Tr. 781.) Dr. Hayek, however, did find upon examination that Ms. Hurst demonstrated left lower extremity weakness. (Tr. 782.) She was diagnosed with lumbar radiculopathy and tobacco dependence, advised on smoking cessation, and prescribed nicotine patches and medication to help quit smoking. (*Id.*) She was also referred for x-rays of the right knee and bilateral hips, which were normal. (Tr. 416-17, 420-21, 783-84.) She returned to Dr. Hayek on December 5, 2019, and reported chronic low back pain but denied all specific, current symptoms in the Review of Symptoms, including back pain. (Tr. 778.) The only relevant abnormality on examination was the prior left lower extremity weakness. (Tr. 779.)

---

[3] Radiculopathy is a range of symptoms caused by the pinching of a nerve root in the spinal column. *See Radiculopathy*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/22564-radiculopathy (last visited Aug. 7, 2024).

Ms. Hurst was admitted to the hospital for three days due to acute diverticulitis in March 2020. She received antibiotics and pain medications. (Tr. 424-55, 1303-18.) At discharge on March 14, 2020, the medical provider continued Ms. Hurst on Subutex for chronic abdominal pain, which Ms. Hurst rated as a six on a ten-point scale. (Tr. 424.) Four days later, Ms. Hurst met with Dr. Hayek again for chronic low back pain. (Tr. 774-76.) Again, she reported chronic back pain but also denied all current symptoms. (Tr. 775.) The only relevant abnormality noted on the examination was left lower extremity weakness. (Tr. 776.) She was diagnosed with moderate anxiety and COPD. (Tr. 776.) Ms. Hurst returned to Dr. Hayek in June 2020 (Tr. 913-15), July 2020 (Tr. 909-11), September 2020 (Tr. 906-08), November 2020 (Tr. 903-05), and December 2020 (Tr. 900-02). Her examination results were similar to her March 2020 findings: her Review of Symptoms was negative, and the only relevant abnormality noted on examination was left lower extremity weakness. The exception was that, in September 2020, Ms. Hurst presented with some respiratory abnormalities, including decreased breath sounds, that were not reproduced in November or December 2020. (Tr. 907.)

Ms. Hurst received treatment at Healthcare Services for opioid dependence from April to October 2020. On May 16, 2020, she reported that she had "been dealing with a lot of things lately, depression, [and] not sleeping well." (Tr. 795.) She reported crying every day and said she needed to find a psychiatrist. (*Id.*) She further reported waking up throughout the night and stated that her medications were not helping her. (*Id.*) On May 30, 2020, her toxicology screen was positive. (Tr. 794.) On June 13, 2020, Ms. Hurst reported that her back pain was causing her to have a bad day. (Tr. 793.) She reported being "severely depressed" and said that she was going to see her doctor on June 17, 2020. (*Id.*) On July 11, 2020, she reported that it had been a "little crazy with her physical therapy and everything because she is having problem with her hip" but she stated that

she is feeling a little bit better. (Tr. 792.) She reported that she had no issues since her last visit and that she had refrained from illicit drug use since her last visit. (*Id.*)

On August 8, 2020, Ms. Hurst reported that she was homeless. (Tr. 790). She was crying and upset. (*Id.*) On September 5, 2020, she reported no issues since her last visit and again stated that she was refraining from illicit drug use. (Tr. 789.) She reported that she was in treatment to manage her pain and said "when she tried getting off her pain meds it was hard for her she couldn't function." (*Id.*)

Ms. Hurst was admitted for inpatient psychiatric care from February 6 to February 11, 2021, after an intentional overdose of Ativan, meloxicam, fluoxetine, and pregabalin. (Tr. 820-83.) The intentional overdose occurred in the context of a work stressor; she had returned to work as a certified nursing assistant but was dismissed after an argument with her supervisor regarding her coworkers' work ethics and home stressors of frustrations with her boyfriend, who was still in a relationship with his wife. (Tr. 820.) She was discharged to return to normal activities and prescribed buspirone, hydroxyzine pamoate, pantoprazole, trazodone, and venlafaxine. (Tr. 821-22.) Her prior prescriptions for Ativan, Lyrica, and Prozac were discontinued. (Tr. 822.)

Approximately two weeks after discharge, Ms. Hurst followed up with Larry Gitelman, CNRP. (Tr. 891-93.) On mental status examination, Ms. Hurst was restless, tearful, agitated, irritable, and depressed with a labile affect; had poor attention and concentration and moderate impulsivity; and reported severe depression and anxiety. (Tr. 892.) Mr. Gitelman encouraged Ms. Hurst to begin therapy, discontinued venlafaxine, and started Ms. Hurst on Effexor. (Tr. 893.)

Ms. Hurst returned to Dr. Hayek on May 17, 2021. (Tr. 897.) She reported some increased stress at home because she was "dealing with her grandchildren and her daughter was somewhat unappreciative of the effort that [she] was making in trying to help her out." (Tr. 898.) She

described better pain control with Lyrica and medical marijuana and her Review of Systems was negative. (Tr. 898.) Her physical examination still demonstrated left lower extremity weakness. (Tr. 899.) She attended follow-up appointments with Dr. Hayek in June 2021 (Tr. 1069-71) and August 2021 (Tr. 1066-68). Her examinations remained at baseline. (Tr. 1069-71, 1066-68.)

On October 4, 2021, Ms. Hurst underwent a consultative psychological evaluation with Bryan Krabbe, Psy.D. (Tr. 1038-43.) She appeared sad "as she displayed a downcast facial expression during the evaluation." (Tr. 1040.) She demonstrated below average short-term memory, attention, and concentration skills, and her intellectual functioning also appeared to be below normal. (Tr. 1041-42.) On October 5, 2021, Ms. Hurst presented as anxious with abnormal affect to Dr. Hayek. (Tr. 1064.) Her examination revealed left lower extremity weakness. (*Id.*) She also had bilateral upper extremity numbness and weakness. (*Id.*) Dr. Hayek referred Ms. Hurst to physical therapy and a neurosurgeon. (Tr. 1063-65.)

On December 1, 2021, Mark Weiner, M.D., treated Ms. Hurst for cervical radiculitis. (Tr. 1254-56.) She had pain in the right side of her neck, shoulder blade, and arm. (Tr. 1254.) She had numbness and tingling in her right hand. (*Id.*) She was unable to perform daily activity due to weakness in her hand. (*Id.*) Her pain level was 7 out of 10. (*Id.*)

A December 30, 2021, cervical MRI showed degenerative changes most prominent at C5-C6 with bilateral foraminal stenosis at that level, right greater than left. (Tr. 1264-65.) Dr. Winer recommended Ms. Hurst for an anterior cervical discectomy and fusion, which she underwent on February 1, 2022. (Tr. 1289.) Two weeks following the surgery, she returned to care with Dr. Hayek. Ms. Hurst's Review of Systems was negative. (Tr. 1061 ("She reports no muscle aches, no muscle weakness, no arthralgias/joint pain, no back pain, and no swelling in the extremities.")). Upon examination, Ms. Hurst was anxious with an abnormal affect and left leg weakness. (Tr.

1059-62.) She also presented with respiratory abnormalities, such as decreased breath sounds, diminished air movement, and expiratory wheezing, for which Dr. Hayek prescribed Ventolin and Symbicort. (Tr. 1059-62.)

On August 17, 2022, Ms. Hurst sought emergency care for a three-day history of acute abdominal pain. (Tr. 1415.) Her initial intake examination was normal (Tr. 1416) but additional workup was suggestive of viral gastroenteritis (Tr. 1418). The medical provider instructed Ms. Hurst to increase her fluid intake, rest, and follow up with her primary care provider. (Tr. 1419.) She followed up with Dr. Hayek four days later, at which time Ms. Hurst was back to baseline. Specifically, her Review of Systems was negative and the only relevant abnormality on examination was her left lower extremity weakness. (Tr. 1241-43.)

Ms. Hurst received weekly individual counseling in November 2022. (Tr. 1337-96.) Throughout therapy, she reported having no concerns with activities of daily living. (Tr. 1339, 1343, 1347.) Mental status examinations initially showed some abnormalities—a sad mood on November 9 and a sad mood with decreased appetite and impaired sleep on November 11—but her mental status was normal by November 18. (Tr. 1339, 1343. 1347.)

### D. Relevant Statements and Hearing Testimony

#### 1. *Ms. Hurst's Hearing Testimony*

Ms. Hurst testified that she has back and knee pain. (Tr. 56.) She further testified that her depression and severe anxiety have worsened since her last administrative hearing. (Tr. 57.) She testified that her mental health conditions worsened when she was in pain and "coming off of medicine by [her]self." (*Id.*) She stated that her depression causes her to cry a lot, and her frequent pain contributes to this. (*See* Tr. 57-58.) She testified that following her back surgery, she has radiating pain into her legs. (Tr. 63.) She further testified that she experiences swelling in her knees

and that she has difficulty climbing stairs. (*Id.*) She stated that she could sit for 30 minutes at a time, stand for only 10 to 15 minutes, and walk for about 20 minutes. (Tr. 65-67.) She testified that she could not lift five pounds. (Tr. 67.) She also testified that she had numbness in her hands. (Tr. 58-59.)

### 2. *Vocational Expert's Hearing Testimony*

The ALJ asked the VE whether an individual with Ms. Hurst's age, education, and work experience could perform work at the sedentary exertional level if she must be afforded the opportunity for a brief one to two-minute change of position at intervals not to exceed 30 minutes without being off-task; can occasionally climb ramps or stairs, balance, stoop, crouch, and kneel; never crawl nor climb ladders, ropes, or scaffolds; should avoid concentrated exposure to extreme cold, extreme heat, and excessive vibration; and should avoid all exposure to all hazards such as dangerous moving machinery and unprotected heights. (Tr. 70.) The VE opined that the individual could not perform Ms. Hurst's past relevant work but could perform work as a document preparer, order clerk, and final assembler. (Tr. 70-71.)

The ALJ then asked the VE whether this individual could perform at the sedentary exertional level if she must be afforded the opportunity for a brief one to two-minute change of position at intervals not to exceed 30 minutes without being off-task; can never climb and crawl; can occasionally balance, crouch, kneel, or stoop; can have no exposure to weather; can have no more than occasional exposure to non-weather temperature extremes of heat or cold, wetness and humidity, vibration, or atmospheric conditions; and can have no exposure to hazards; can understand, remember, and carry out simple instruction; cannot perform work that requires a specific production rate pace such as assembly line work or an hourly production quota; can occasionally deal with changes in a routine work setting; can never have contact with the public;

and can have no more than occasional interaction with coworkers and supervisors. (Tr. 71-72.)
The VE opined that this individual could perform work as a document preparer, final assembler,
and electronic assembler. (Tr. 72.)

The ALJ asked the VE what the off-task tolerance for the opined jobs would be. (Tr. 72.)
The VE responded that an individual could not be off task more than 10 percent of the time. (Tr.
72-73.) The VE clarified that this percentage of time does not permit an individual to lie down.
(Tr. 73.) The ALJ then asked what level of absenteeism would be tolerated for the opined jobs.
(*Id.*) The VE testified that an employee could be absent no more than one day per month. (*Id.*)

## IV.    THE ALJ DECISIONS

In an August 2019 decision, an ALJ determined that Ms. Hurst retained the following
residual functional capacity ("RFC"):

> to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a)
> except: afforded the opportunity for brief one (1) to two (2) minute changes of
> position at intervals not to exceed 30 minutes without being off task; limited to
> occasional climbing of ramps or stairs, balancing, stooping, crouching and
> kneeling, and no crawling or climbing of ladders, ropes or scaffolds; should avoid
> concentrated exposure to extreme cold, extreme heat, and excessive vibration; and,
> should avoid all exposure to all hazards such as dangerous moving machinery and
> unprotected heights.

(Tr. 88.)

In her January 2023 decision, the ALJ first determined Ms. Hurst meets the insured status
requirements of the Social Security Act through December 31, 2019. (Tr. 19.) The ALJ then
determined that Ms. Hurst has not engaged in substantial gainful activity since August 16, 2019,
the alleged disability onset date. (Tr. 20.) The ALJ further determined that Ms. Hurst has the
following severe impairments: degenerative disc disease of the cervical spine, status post surgery;
post laminectomy syndrome; lumbar radiculopathy; degenerative joint disease of the bilateral
knees, status post surgery; essential hypertension; chronic obstructive lung disease; obesity;

12

chronic pain syndrome; major depressive disorder; generalized anxiety disorder; panic disorder; bipolar disorder; post-traumatic stress disorder; and insomnia. (*Id.*) However, the ALJ determined that none of these impairments—either individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 20-24.)

The ALJ determined that Ms. Hurst has the residual functional capacity ("RFC") to perform at the sedentary exertional level except that she would need a sit/stand option to allow for a brief change of position for one to two minutes every thirty minutes; cannot climb or crawl; can occasionally balance, crouch, kneel, or stoop; cannot have exposure to weather; can have no more than occasional exposure to non-weather temperature extremes of heat or cold, wetness and humidity, vibration, or atmospheric conditions; cannot have exposure to hazards; can understand, remember, and carry out simple instructions; cannot perform work that requires a specific production rate pace, such as assembly line work or an hourly production quota; can occasionally deal with changes in a routine work setting; and cannot have contact with the public or more than occasional interaction with coworkers and supervisors. (Tr. 24-30.) The ALJ then determined that Ms. Hurst is unable to perform her past relevant work as a nurse assistant. (Tr. 30-31.)

The ALJ determined that transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Ms. Hurst is not disabled. (Tr. 31.) The ALJ determined that, considering Ms. Hurst's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Ms. Hurst can perform such as employment as a document preparer, final assembler, and electronic assembler. (Tr. 31-32.) Accordingly, the ALJ concluded that Ms. Hurst was not disabled within the meaning of the Social Security Act since her alleged disability onset date through the date of the ALJ's decision. (Tr. 32.)

## V.  LAW AND ANALYSIS

### A.  <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the

SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

**B.  Standard for Disability**

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

## C.  **Analysis**

### 1.  ***The ALJ properly evaluated the medical opinions of Drs. Krabbe and Hayek.***

Ms. Hurst challenges the ALJ's evaluation of the opinions from Drs. Krabbe and Hayek. Ms. Hurst's arguments are not well-taken.

At Step Four of the sequential evaluation, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how she considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2). According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520(c)(1)-(2).

"If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7. "It is well-established that an ALJ need not adopt all findings in a medical opinion when determining an RFC." *Fiktus v. Kihakazi*, No. 1:20CV1689, 2021 WL 5567866, at *9 (N.D. Ohio July 29, 2021) (citing *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009)), *report and recommendation adopted sub nom. Fiktus v. Comm'r of Soc. Sec.*, 2021 WL 5566805 (N.D. Ohio Nov. 29, 2021). However, the ALJ is still required to explain why he did not adopt a portion of an

16

opinion if the RFC conflicts with it. *Kearns v. Comm'r of Soc. Sec.*, No. 3:19 CV 01243, 2020 WL 2481707, at *13 (N.D. Ohio Feb. 3, 2020).

> **a. The ALJ was not required to evaluate Dr. Krabbe's statements because they do not constitute a medical opinion.**

Ms. Hurst argues that the ALJ erred when she failed to evaluate the persuasiveness of an opinion from Dr. Krabbe, a consultative examiner. (ECF No. 9, PageID#1502-03.) The Commissioner contends that Dr. Krabbe's statements from his consultative examination were not a medical opinion for which an ALJ had to articulate the persuasiveness. (ECF No. 10, PageID#1525-26.) Specifically, the Commissioner argues that Dr. Krabbe's statements are mere summaries of Ms. Hurst's reported illness history and symptomology or her performance on mental status testing, not statements about what Ms. Hurst could still do despite her impairments or whether she had one or more impairment-related limitations or restrictions. (*Id.*) In addition, the Commissioner argues that "[t]o the extent the ALJ was required to consider [Dr. Krabbe's] report, together with all other relevant evidence, the decision makes plain that the ALJ did so." (*Id.* (citing Tr. 22-23.)) The Commissioner's argument is well-taken.

A "medical opinion" is defined as "a statement from a medical source about what [claimants] can still do despite [their] impairment(s) and whether [they] have one or more impairment-related limitations or restrictions" in their ability to perform the physical, mental, or other demands or work. 20 C.F.R. § 404.1513(a)(2). Here, Dr. Krabbe merely reiterates Ms. Hurst's medical history, symptomology, and performance on mental status examinations. (*See generally* Tr. 1042.) For example, Dr. Krabbe described Ms. Hurst's medical and symptomology, including that she had a "history of problems with attention and concentration within work environments involving difficulty completing tasks in a timely and effective manner," "a history of impulsive behavior at school," and "a history of emotional deterioration in response to work

pressure." (Tr. 1042.) Moreover, Dr. Krabbe merely recites the mental status examination results, including that Ms. Hurst "performed adequately on a brief abstract reasoning activity," "performed below average on a brief short-term memory activity," "displayed adequate task persistence when answering questions," and "displayed no indication of distraction during the evaluation." (*Id.*) A mere recitation of a claimant's medical history and symptoms is not a proper medical opinion. *See, e.g.*, *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) ("Dr. Killeffer's pain-related statement, on the other hand, is not a 'medical opinion' at all—it merely regurgitates Francis' self-described symptoms."); *Harden v. Comm'r of Soc. Sec.*, No. 16-12394, 2017 WL 4946580, at *8 (E.D. Mich. Aug. 24, 2017) ("The medical source statement's mere parroting of plaintiff's reported symptoms and complaints (as dictated by plaintiff the very day the statement was completed) oppugns its status as an actual medical opinion under the regulatory definition.").

Ms. Hurst disputes the Commissioner's characterization that Dr. Krabbe provided mere recitations of the examination results and instead asserts that Dr. Krabbe provided some limitation in the area of attention and concentration. She points to the following statement by Dr. Krabbe: "The claimant had difficulty completing both serial 7s and serial 3s tasks, which suggests difficulty maintaining attention and focus. The claimant had difficulty recalling digits backwards, a simple structured task to assess attention and concentration." (Tr. 1042.) This statement does not rise to the level of a medical opinion. Again, Dr. Krabbe merely recites the mental status examination results. (*Id.*) To the extent that Ms. Hurst contends that Dr. Krabbe's statement that Ms. Hurst's difficulty in completing serials 7s and serial 3s tasks "suggests difficulty maintaining attention and focus" (*id.*), this is not a medical opinion because Dr. Krabbe does not state whether Ms. Hurst has one or more impairment-related restrictions. *See* 20 C.F.R. § 404.1513(a)(2). Rather, Dr. Krabbe

18

merely "*suggests*" that this could be the case. (Tr. 1042 (emphasis added)). Thus, Dr. Krabbe's statements were not an opinion that required adoption or discussion by the ALJ.

Ms. Hurst contends that "the Court has routinely found Dr. Krabbe's opinion found in other cases in the identical format as the current opinion to meet the regulatory definition of an opinion and subject to the revised regulations regarding the persuasiveness of opinions." (ECF No. 11, PageID#1538 (citing *Miner v. Comm'r of Soc. Sec.*, 2023 WL 4545948, at *16 (N.D. Ohio July 11, 2023), *report and recommendation adopted*, 2023 WL 4545163 (N.D. Ohio July 13, 2023); *Langford v. Comm'r of Soc. Sec. Admin.*, 2023 WL 3058160, at *26 (N.D. Ohio Apr. 24, 2023); *Klapp v. Comm'r of Soc. Sec. Admin.*, 2022 WL 310228, at *19 (N.D. Ohio Feb. 2, 2022).  Ms. Hurst's cited case law does not support this proposition. In fact, upon closer review, Ms. Hurst merely points to an ALJ's assessment of opinions from Dr. Krabbe in these cases, *not* the Court's interpretation of whether Dr. Krabbe's statements rose to the level of a medical opinion. *See Miner*, 2023 WL 4545948, at *16 (summary of Dr. Krabbe's medical opinion and the ALJ's evaluation of such opinion); *Klapp*, 2022 WL 310228, at *19 (summary of Dr. Krabbe's findings and the ALJ's analysis of Dr. Krabbe's medical opinion). Thus, Ms. Hurst's argument is not well-taken.

Finally, the Commissioner correctly argues that, to the extent the ALJ was required to consider Dr. Krabbe's report, the ALJ assessed Dr. Krabbe's report together with the relevant evidence. (Tr. 22-23.) Accordingly, Ms. Hurst's argument lacks merit.

### b. The ALJ properly evaluated the opinion of Dr. Hayek regarding her mental and physical RFC.

Ms. Hurst challenges the ALJ's evaluation of Dr. Hayek's opinion regarding her mental and physical RFC. Specifically, she contends that the ALJ failed to comply with the agency regulations because the ALJ failed to discuss Dr. Hayek's notes or the abnormal findings in the mental health treatment notes and the supportive content of the treatment notes from other

providers. (ECF No. 9, PageID#1504-06.) The Commissioner disagrees. (ECF No. 10, PageID#1526-27.) Ms. Hurst's arguments are not well-taken.

Here, the ALJ addressed the supportability of Dr. Hayek's opinion regarding the mental RFC. Specifically, the ALJ stated that Dr. Hayek's opinion provided no support for the opined limitations regarding Ms. Hurst's difficulties in maintaining concentration, persistence, or pace or anticipated absenteeism. (Tr. 30; *see* Tr. 1034.) Substantial evidence supports the ALJ's supportability analysis because Dr. Hayek's opinion is a checkbox form that lacks meaningful explanation in support of his conclusion. The Sixth Circuit has held that a checkbox opinion without explanation is "patently deficient." *Hernandez v. Comm'r of Soc. Sec*., 644 F. App'x 468, 475 (6th Cir. 2016) (finding that these types of opinions are "'weak evidence at best' and meets [the Sixth Circuit's] patently deficient standard") (citation omitted). Dr. Hayek merely reported Ms. Hurst's diagnosis of depression and stated that "depression" and "altered concentration" were the clinical findings that supported his opinions. (Tr. 1034.) These explanations do not convert the checkbox form nature of Dr. Hayek's opinions. *See, e.g.*,  *Duke v. Comm'r of Soc. Sec*., No. 21-CV-29, 2022 WL 1075171, at *4 (N.D. Ohio Apr. 11, 2022) (finding that medical source's form was a check box form where the form included check boxes and listed claimant's asthma and POTS diagnoses; described treatment as "medications; listed symptoms; and stated that the medical findings were a "fast heart rate and low blood pressure"); *Harcula v. Comm'r of Soc. Sec*., No. 1:22-cv-01950-CEF, 2023 WL 6050291, at *14 (N.D. Ohio Aug. 31, 2023), *report and recommendation adopted*, 2023 WL 6049326 (N.D. Ohio Sept. 15, 2023) (finding medical provider's opinion was a checkbox form where explanations consisted of a list of the claimant's diagnoses; a list of medications and their corresponding dosages; a description of the clinical findings, stating "obsessive thoughts and high anxiety interfere with concentration, mood [,] and

decision making"; and a prognosis stating "crisis intervention 2016"); *Nussbaum v. Comm'r of Soc. Sec.*, No. 5:22-CV-01763-SL, 2023 WL 5353142, at *9 (N.D. Ohio Aug. 1, 2023), *report and recommendation adopted*, 2023 WL 5352398 (N.D. Ohio Aug. 21, 2023) (finding medical source's opinion's explanation that consisted of a list of claimant's diagnoses and a statement that some diagnoses would pose limitations that would interfere with his ability to sustain work was a checkbox form).

Next, the ALJ adequately addressed the consistency of Dr. Hayek's opinion regarding her mental RFC. To the extent that Ms. Hurst asserts that the ALJ should have again addressed the evidence in the medical opinion evaluation, this argument is unpersuasive. An ALJ may "rely on previously articulated information to support his opinion analysis." *Jackson v. Comm'r of Soc. Sec.*, No. 1:22-CV-01789-JRA, 2023 WL 7018124, at *7 (N.D. Ohio Aug. 14, 2023), *report and recommendation adopted*, 2023 WL 7408090 (N.D. Ohio Nov. 9, 2023); *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (unpublished) ("No doubt, the ALJ did not reproduce the list of these treatment records a second time when she explained why Dr. Bell's opinion was inconsistent with this record. But it suffices that she listed them elsewhere in her opinion.") (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)).

Here, the ALJ determined that Dr. Hayek's opinion was "inconsistent with the remainder of the medical evidence[.]" (Tr. 30.) Earlier in the decision here, the ALJ discussed those inconsistencies with other medical sources in the record. (Tr. 23, 28; *see* Tr. 820-22, 842-44.) Specifically, the ALJ considered evidence related to Ms. Hurst's inpatient admission (Tr. 23, 28; *see* Tr. 820-22, 842-44), her post-discharge evaluation (Tr. 23, 28; *see* Tr. 891-92), therapy records (Tr. 23, 28; *see* Tr. 1342), and emergency department records related to her viral gastroenteritis (Tr. 23, 28; *see* Tr. 1417.)

Ms. Hurst asserts that there were records that were supportive and consistent with Dr. Hayek's mental limitations that the ALJ failed to discuss. But there is no requirement that an ALJ must do so; indeed, an ALJ is not "required to discuss each piece of data in [his] opinion, so long as [he] consider[ed] the evidence as a whole and reach[e] a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam)). The ALJ here meets that burden because the ALJ articulated adequate reasoning for why Dr. Hayek's limitations were not consistent with other evidence in the record, and this reasoning is supported by substantial evidence. Thus, Ms. Hurst's argument regarding the ALJ's evaluation of Dr. Hayek's opinion of her mental RFC lacks merit.

The ALJ also appropriately evaluated Dr. Hayek's opinion regarding Ms. Hurst's physical RFC. The ALJ here addressed the supportability of Dr. Hayek's opinion. Like Dr. Hayek's opinion regarding Ms. Hurst's mental RFC, his opinion regarding Ms. Hurst's physical RFC is a mere checkbox form. (*See* Tr. 30 ("[T]here is no support provided in Dr. Hay[e]k's Medical Source Statement…for any significant changes in the claimant's condition that would warrant change in her abilities to sit, stand, walk and lift[.]")). Furthermore, as the ALJ stated, the opined limitations were not supported by Dr. Hayek's own treatment notes, which the ALJ had previously evaluated as part of her overall analysis of the medical evidence. (Tr. 25-27; *see* Tr. 910, 919, 985, 992, 1059-62, 1063-65, 1073, 1090, 1145, 1152, 1156, 1160, 1167, 1177-80, 1182, 1212, 1241-47.)

The ALJ also addressed consistency by stating that Dr. Hayek's opinion was inconsistent with the remainder of the record. (Tr. 29-30.) This discussion of the other medical evidence included records related to Ms. Hurst's back surgery. (Tr. 25-27; *see* Tr. 1254-57, 1264-65, 1274-76, 1289-90, 1295-96.) Thus, the ALJ properly complied with agency regulations in evaluating

22

Dr. Hayek's opinion. Ms. Hayek may present evidence that, in her interpretation, support further limitations, but it is not this Court's role to reweigh the evidence. So long as substantial evidence supports the ALJ's determination, this Court must affirm. Accordingly, this argument lacks merit.

### 2. *The ALJ complied with the Drummond/Earley standard.*

Ms. Hurst, relying on *DiLauro v. Comm'r of Soc. Sec.*, No. 5:19cv2691, 2021 WL 1175415, at *3-4 (N.D. Ohio Mar. 29, 2021), argues that the ALJ relied too heavily on the RFC finding from the prior ALJ decision. (ECF No. 9, PageID#1507-09.) She contends that in this case there was a change in circumstances that required a deviation from the prior ALJ's findings. (*Id.* at PageID#1507.)[4] For the following reasons, this argument lacks merit.

At issue in this case is the application of the Acquiescence Ruling 98-4(6), based on the Sixth Circuit's decision in *Drummond v. Commissioner of Social Security*, 126 F.3d 837, 838 (6th Cir. 1997). In *Drummond*, 126 F.3d at 838, an ALJ denied a claimant's initial application based on the determination that the claimant could not perform her past work but retained the residual functional capacity for sedentary work. After the claimant re-filed her disability claim, a second ALJ denied the application based on a determination that the claimant retained an RFC suitable for medium level work. *Id.* at 839. Upon review, the Sixth Circuit held that "the principles of res judicata can be applied against the Commissioner," and that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Id.* at 842.

---

[4] Ms. Hurst devotes two sentences in her reply brief to argue for the first time that the ALJ incorrectly applied a Fourth Circuit standard rather than a Sixth Circuit standard. Ms. Hurst's skeletal argument is waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones."). This belated argument is also waived because a party may not raise an entirely new argument on reply. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008).

After *Drummond*, the SSA adopted Acquiescence Ruling 98-4(6), 1998 WL 283902 (June

1, 1998). This Ruling provided that:

> When adjudicating a subsequent disability claim with an unadjudicated period
> arising under the same title of the Act as the prior claim, adjudicators must adopt
> such a finding from the final decision by an ALJ or the Appeals Council on the
> prior claim in determining whether the claimant is disabled with respect to the
> unadjudicated period unless there is new and material evidence relating to such a
> finding or there has been a change in the law, regulations, or rulings affecting the
> finding or the method for arriving at the finding.

1998 WL 283902, at *3.

But in *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 933 (6th Cir. 2018), the Sixth Circuit

explained that "[w]hen an individual seeks disability benefits for a distinct period of time, each

application is entitled to review." Thus, the *Earley* court held that "res judicata only 'foreclose[s]

successive litigation of the very same claim.'" *Id.* ("[A] claim that one became disabled in 1990 is

not the same as a claim that one became disabled in 1994."). Therefore, *Earley* "establishes that a

claimant's second application is entitled to review free of any presumption that a previously

determined RFC is correct." *Wahlert v. Comm'r of Soc. Sec.*, No. 5:22-cv-01324-SL, 2023 WL

4079203, at *9 (N.D. Ohio May 15, 2023) (citing *Nadjil v. Comm'r of Soc. Sec.*, No. 1:21-cv-

1578-SL, 2022 WL 2820413, at *9-10 (N.D. Ohio July 8, 2022)), *report and recommendation

adopted*, 2023 WL 4417397 (N.D. Ohio July 10, 2023)).

Significantly, the *Earley* court recognized that "[f]resh review is not blind review. A later

administrative law judge may consider what an earlier judge did if for no other reason than to strive

for consistent decision making." *Earley*, 893 F.3d at 934. Thus, "when a claimant has previously

filed an application for benefits an ALJ has rendered a final decision, an ALJ considering a

claimant's new application encompassing a different time period may find that the prior ALJ's

24

findings are legitimate and adopt those findings absent new and material evidence." *Black v. Comm'r of Soc. Sec.*, No. 1:20-cv-00183, 2021 WL 371730, at *16 (N.D. Ohio Feb. 3, 2021).

Here, *DiLauro* is factually distinguishable from the instant case. In *DiLauro*, the court held that an ALJ neglected to give a plaintiff's second application the fresh look required by *Earley*. because the ALJ determined that "no new and material evidence exist[ed] to justify not adopting the residual functional capacity from the previously adjudicated period." 2021 WL 1175415, at *3. The *DiLauro* court concluded remand was necessary because the ALJ did not give a fresh look, a required by *Earley*, to substantial new evidence but rather placed great weight on the opinions of the state agency consultant who adopted the prior ALJ's decisions. *Id.*

But the ALJ here satisfied *Earley* because she specifically considered Ms. Hurst's new medical evidence and gave a fresh look at the entire record. While the ALJ assigned significant weight to the prior ALJ decision's findings, the ALJ only did so to the extent the new evidence did not warrant deviation from those prior findings. (Tr. 28-29.) It is not improper for the subsequent ALJ to measure the new medical evidence "against the backdrop" of the prior RFC finding instead of assessing the new evidence on its own merits. *Dennis D. v. Comm'r of Soc. Sec.*, No. 23-3667, 2024 WL 1193662, at *6 (6th Cir. 2024). Rather, the Sixth Circuit has held that "it is perfectly acceptable for a subsequent ALJ to presume the accuracy of a prior finding," for this promotes "finality, efficiency, and consistent treatment of like cases." *Id.* Significantly, the Sixth Circuit has instructed that:

> [T]he suggestion that an ALJ considering a subsequent application should not evaluate a claimant's new records for evidence of a significant change in relation to a prior valid finding strikes us as an overly broad reading of *Earley*. Presuming accuracy is not the same as treating prior findings as binding.

*Id.*

Reviewing the decision as a whole, the ALJ provided a detailed account of Ms. Hurst's medical records from her alleged disability onset date through the date of the new decision. (Tr. 20-27.) Based on this review, the ALJ ultimately reached an RFC determination that was *more restrictive* than what was included in the prior ALJ decision. For example, the ALJ in the prior found that Ms. Hurst could occasionally climb ramps and stairs. (Tr. 88.) Yet, the ALJ in the current case found that Ms. Hurs could *never* climb ramps and stairs. (Tr. 24.) Similarly, the prior ALJ decision found Ms. Hurst's mental impairments to be non-severe and assessed no mental RFC limitations (Tr. 87-88), whereas the current ALJ decision found Ms. Hurst's mental impairment severe and assessed several mental limitations. (Tr. 20, 24.) Significantly, it is permissible for a subsequent ALJ to afford persuasive weight to a prior decision. *Earley*, 893 F.3d at 933 (explaining that the prior ALJ's findings may be considered a "legitimate, albeit not binding, consideration in reviewing a second application).

In sum, the ALJ considered new evidence when determining the RFC and ultimately found that Ms. Hurst had a new RFC that was more restrictive than was found in the prior ALJ decision. As the *Earley* court observed, "[f]resh review is not blind review." *Id.* at 934. Accordingly, "a later administrative law judge may consider what an earlier judge did if for no other reason than to strive for consistent decision making." *Id.* Thus, the ALJ applied the proper standard, and Ms. Hurst's argument lacks merit.

### 3. *The ALJ did not improperly interpret raw medical data.*

Finally, Ms. Hurst argues that, in the absence of properly credited medical opinion evidence accounting for the RFC, the ALJ interpreted raw medical data and determined an RFC lacking substantial evidentiary support. (ECF No.9, PageID#1503-04, 1512-14.) Yet, there is nothing to show that the ALJ determined the RFC based on a lay understanding of raw medical

data. As the Commissioner argues, Ms. Hurst appears to conflate objective medical evidence—which the regulations direct the ALJ to consider—with raw medical data, which involves evidence such as uninterpreted x-rays and laboratory results. *Compare Harris v. Comm'r of Soc. Sec.*, No. 1:14-cv-1212, 2015 WL 770340, at *19 (N.D. Ohio Feb. 23, 2015) (collecting cases indicating that an ALJ needs a medical opinion to interpret "raw medical data"); *Mokbel-Aljahami v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018) (rejecting the argument that an ALJ is required to rely on a physician opinion when the ALJ could rely on her administrative assessment of objective medical evidence in the record).

Nothing in the record here indicates the ALJ interpreted raw medical data. Rather, the record reveals that the ALJ arrived at her conclusions after reviewing objective medical evidence (*e.g.,* results from physical examinations), medical opinions, and Ms. Hurst's written and oral statements. (Tr. 25-31.) And to the extent that Ms. Hurst attempts to contend that substantial evidence does not support the ALJ's determination because it does not correspond to a particular physician's opinion, this argument is unpersuasive. An ALJ is not required to review *any* medical opinion before crafting an RFC determination. *See Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 226 (6th Cir. 2019) ("No bright-line rule exists in our circuit directing that medical opinions must be the building blocks of the residual functional capacity finding."); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719 728 (6th Cir. 2013) (rejecting the argument that the ALJ is required to base her determination on a physician's opinion). Accordingly, this argument lacks merit.

## VI.    CONCLUSION

Based on the foregoing, the Court AFFIRMS the Commissioner's final decision.

**IT IS SO ORDERED.**

Dated: August 21, 2024                                    */s Jennifer Dowdell Armstrong*
                                                          Jennifer Dowdell Armstrong
                                                          U.S. Magistrate Judge

28